IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UTE MOUNTAIN UTE TRIBE,

      Plaintiff,

vs.                                                                              No. CIV 07-772 JP/WDS

RICK HOMANS, Secretary of Taxation
and Revenue Department for the State
of New Mexico,

      Defendant.

# FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

*Background*

The State of New Mexico levies five taxes on oil and gas operations throughout New Mexico, including operations on the Ute Mountain Ute Reservation, that lies partly within the State of New Mexico along New Mexico's border with Colorado.  On August 10, 2007, the Ute Mountain Ute Tribe ("UMUT") filed a Complaint (Doc. No. 1) against the Secretary of the Taxation and Revenue Department for the State of New Mexico.  The Complaint is divided into three claims for relief.  Under the First Claim for Relief, the UMUT alleged that the imposition of the state taxes violates federal common law, the federal right of the UMUT to self-determination, and the Supremacy Clause of the United States Constitution. In the Second Claim for Relief, the UMUT asserted that the State of New Mexico's imposition of an *ad valorem* property tax on oil and gas production equipment violates the Fourteenth Amendment and the Enabling Act of June 20, 1910 in which the State of New Mexico disclaimed any taxing jurisdiction over lands held by the United States of America for the benefit of tribes.  In the Third Claim for Relief, the UMUT sued under 42 U.S.C. § 1983 claiming that the State of New

Mexico taxes deprive individual Ute Mountain Ute Tribal members of their "property rights and the privileges and immunities secured to them under federal law and the Constitution." The UMUT seeks an injunction prohibiting the State of New Mexico from imposing the five state taxes on operations on UMUT's lands in New Mexico.

In a Memorandum Opinion and Order (Doc. No. 15) filed February 4, 2008, the Court denied Defendant's Motion to Dismiss (Doc. No. 7) as to the First Claim for Relief and the Second Claim for Relief, but granted the Motion to Dismiss as to the Third Claim for Relief and, therefore, dismissed with prejudice the UMUT's Third Claim for Relief under 42 U.S.C. § 1983 and its accompanying claim for attorney's fees under 42 U.S.C. § 1988.

On May 6 through May 8, 2009, the Court held a non-jury trial on the UMUT's remaining claims. Following the presentation of all evidence, the Court issued proposed Findings of Fact based on the evidence introduced at trial. Counsel were permitted to and did submit written comments and suggestions on the Court's proposed Findings of Fact. After taking the comments and suggestions into account, the Court provided counsel with the Court's final Findings of Fact (which were not docketed at the time). The Court then permitted counsel to submit briefs on the law as it related to the Court's final Findings of Fact. The parties have now submitted briefs on the law, which the Court found to be helpful and which the Court has taken into account.

In accordance with FED. R. CIV. P. 52(a), the Court makes the following FINDINGS OF FACT AND CONCLUSIONS OF LAW.

<u>FINDINGS OF FACT</u>

*The UMUT and Its Reservation*

1.      The UMUT is a federally recognized Indian Tribe.

2.     A person is eligible to be an enrolled member of the UMUT if the person is at least 50%
Ute Mountain Ute by blood.

3.     There are currently slightly more than two thousand enrolled members of the UMUT.

4.     A reservation for the UMUT ("Reservation")–and reservations for other Ute
Indians–were first established by treaty in 1868. Treaty Between the United States of
America and the Tabeguache, Muache, Capote, Weeminuche, Yampa, Grand River, and
Uintah Bands of Ute Indians, Mar. 2, 1868, 15 Stat. 619; *Cuthair v. Montezuma-Cortez,
Colo. Sch. Dist. No. RE-1*, 7 F. Supp. 2d 1152, 1158 (D. Colo. 1998) (Weminuche band
of Ute Indians now known as UMUT).

5.     The Reservation was decreased in size by the Brunot Agreement, which Congress ratified
in 1874, Act of Apr. 29, 1874, 18 Stat. 37, and again by a second agreement ratified by
Congress in 1880, Act of June 15, 1880, 21 Stat. 199.

6.     The Reservation is a hybrid treaty/statutory reservation; it is not an executive reservation.

7.     The Reservation lies mainly in the State of Colorado, but also lies partly in the State of
Utah and partly in the State of New Mexico.

8.     The headquarters of the UMUT are in Towaoc, Colorado.

9.     The present eastern and southern boundaries of the New Mexico portion of the
Reservation ("New Mexico lands") were fixed by Congress in 1895. Act of Feb. 20,
1895, 28 Stat. 677.

10.    The New Mexico lands are bounded on the north by the New Mexico-Colorado state line.

11.    The present western boundary of the Reservation in New Mexico was fixed in a quiet
title action in the United States District Court for the District of New Mexico between the
UMUT and the Navajo Tribe. Navajo-Ute Boundary Dispute Act of 1968, Pub. L. 90-256

3

(Feb. 14, 1968) (giving district court jurisdiction over the action); *Ute Mountain Tribe of Indians v. Navajo Tribe of Indians*, 409 U.S. 809 (1972) (affirming judgment of the district court).

12.    The New Mexico lands consist of all sections in Townships 31 and 32 North in Ranges 14 and 15 West of the New Mexico Principal Meridian, and the easternmost two-thirds of the sections in Townships 31 and 32 North in Range 16 West of the New Mexico Principal Meridian.

13.    The New Mexico lands are unallotted. Act of Feb. 20, 1895, 28 Stat. 677.

14.    No part of the New Mexico lands is held privately in fee.

15.    The New Mexico lands are held in trust for the UMUT by the United States.

16.    No member of the UMUT resides in the New Mexico lands.

17.    No other person resides in the New Mexico lands.

18.    Tribal members can choose to reside in the New Mexico lands, subject to approval by the UMUT.

19.    The only economic activities on the New Mexico lands are grazing and extraction of oil and natural gas.

20.    The only roads in the New Mexico lands are unpaved roads.

21.    There is no other transportation infrastructure, such as rail lines or air strips, on the New Mexico lands.

22.    Members of the UMUT use the unpaved roads in the New Mexico lands for gathering wood and running livestock; and oil and gas operators use the unpaved roads for survey and for access to their wells and equipment.

23.    Access to the unpaved roads is primarily from New Mexico state roads.

24.  The UMUT and the Bureau of Indian Affairs ("BIA") share jurisdiction over the roads in the New Mexico lands.

25.  The roads in the New Mexico lands are maintained in part by the UMUT and in part by the oil and gas operators.

26.  Before an oil and gas operator creates a new unpaved road on the New Mexico lands for survey purposes, the operator must have approval from the BIA.

27.  Before an oil and gas operator creates or modifies a road on the New Mexico lands for drilling or maintenance purposes, the operator must have approval from the Bureau of Land Management ("BLM").

28.  The State of New Mexico plays no part in the creation, maintenance, or approval of roads on the New Mexico lands.

*Oil and Gas Operations in General*

29.  Oil and natural gas lie in reservoirs underneath the surface of the earth.

30.  In many circumstances, multiple distinct operators have a leasehold or other property interest that grants them the right to extract oil and/or natural gas from the same reservoir.

31.  In that circumstance, the rights are correlative: one operator's exercise of its right to extract oil or natural gas affects the amount and location of the resource in the reservoir and as a result affects the rights of the other operators in the same reservoir.

32.  In the absence of constraints on production, multiple operators extracting oil or natural gas from a common reservoir  will race to extract the resource as quickly as possible.

33.  This race to extract can cause economic waste of the oil or gas resource, either from depressed market prices or from storage costs.

34.     This race to extract can also cause physical waste of the oil or gas resource by decreasing pressure in the reservoir or by causing the resource to flow into other areas, making extraction impossible or inefficient.

35.     Defects in well design or integrity can also cause waste of the resource by allowing escape of the resource or by allowing water into the reservoir.

36.     Historically, waste has been addressed through private agreements or statutory provisions, known as pooling or unitization, that treat a reservoir as a common resource and constrain the operators extracting oil or gas from it.

37.     The constraints are typically in the form of well spacing, setbacks, and limits on the rate of production from a well.

38.     In addition to addressing waste, these constraints allow each operator to receive the operator's just and equitable share of the reservoir.

39.     Statutes may provide for compulsory or forced pooling where the operators are unable to come to agreement.

40.     Pools can grow or shrink as new resources are discovered or existing ones are depleted.

41.     Two pools can become connected through discovery of resources between them.

42.     Extraction of oil and gas often involves extraction of groundwater as a by-product, known as "produced water."

43.     Produced water is typically alkaline and not usable for municipal or agricultural purposes; it is also potentially a pollutant.

44.     Operators often dispose of produced water by injecting it into wells.

45.     Injection of produced water can make oil remaining in a reservoir easier to extract.

46.    If produced water is not injected correctly, a formation or a zone can be fractured, resulting in waste of the resource or contamination of groundwater.

47.    When revenues from a producing well have repaid the expense of drilling it, the well is said to have reached "payout," a term used later in these Findings of Fact.

*New Mexico Regulation of Oil and Gas*

48.    The Oil and Conservation Division of the New Mexico Energy, Minerals, and Natural Resources Department ("NMOCD") is responsible for regulation of oil and gas operations in the State of New Mexico.

49.    The primary mission of NMOCD is to prevent waste and to protect correlative rights; in regulating oil and gas operations, NMOCD also seeks to protect public safety and health.

50.    NMOCD does so in part by defining oil and gas pools and setting well spacing and well setbacks.

51.    When operators are not able to agree on pooling or spacing, NMOCD sometimes issues an order forcing pooling after a public hearing in which the affected operators had the opportunity to participate.

52.    NMOCD also seeks to prevent waste by regulating production and transportation of oil and natural gas.

53.    Operators may request approval from NMOCD for commingling, which includes extracting oil or gas in a single well from multiple strata.

54.    Commingling can cause production issues where, for example, natural gas in one stratum contains much more hydrogen sulfide or water than natural gas in another stratum.

55.    NMOCD approval for commingling may be given in an administrative order or may be decided at a hearing.

56.     Operators may request approval from NMOCD for infill, which is adding a second or third well to a spacing unit in order to drain the unit more efficiently.

57.     Operators may request approval from NMOCD for non-standard well locations.

58.     NMOCD hearings are conducted by administrative law judges, who can require evidence to be produced.

59.     In NMOCD hearings, geologic evidence is usually presented by the operators, but may also be presented by other interested parties.

60.     NMOCD sets standards for casings, the steel pipe and surrounding cement used to construct a well.

61.     Casing defects can cause problems that include blowout of a reservoir, mixing of flow from other zones with a reservoir, contamination of groundwater, and escape of hydrogen sulfide.

62.     NMOCD requires operators in New Mexico, including operators extracting oil and gas on the New Mexico lands, to file forms for applications for permits to drill, for sundry notices, for plugging abandoned wells, and for various reports on wells, including well completion or recompletion reports. Under December 1, 2008 amendments to NMOCD regulations the operators on federal, public, or tribal lands must use BLM forms for these purposes, but the forms remain subject to NMOCD approval. N.M. Admin. Code § 19.15.7.11.

63.     Since 2008, NMOCD also requires operators to file applications for "pit permits" under the "pit rule."

64.     When an operator fails to comply with NMOCD regulations, including the failure to file required forms, NMOCD may revoke the operator's authority to transport natural gas or

oil in the State of New Mexico, making it economically impossible for the operator to continue operations.

65. On one occasion in the early 1990's, the NMOCD cancelled the authority to transport of an operator on the New Mexico lands who had injected produced water into a well under a U.S. Environmental Protection Agency permit but who failed to comply with NMOCD regulations.

66. On one occasion in the late 1980's, NMOCD required an operator on the New Mexico lands to cleanup a spill to NMOCD standards; NMOCD later inspected the site to confirm the work.

67. More recently, the UMUT's  Department of Energy assumed responsibility for detecting spills; once a spill is detected, the Department asks the operator and the BLM to cleanup the spill.

68. NMOCD has general authority to plug and abandon a well when an operator fails to do so, but the UMUT does not allow NMOCD officials to plug wells on the New Mexico lands.

69. NMOCD maintains publicly available geologic records, including records of the geology of the New Mexico lands.

70. NMOCD maintains publicly available records of production of oil and gas by operators, including records of production by operators who extract oil and gas from the New Mexico lands.

*Oil and Gas Underlying the New Mexico Lands*

71. The New Mexico lands lie in the San Juan Basin, a geologic region consisting of sedimentary formations containing reservoirs of oil and natural gas.

72.   There are more than 23,000 active oil and gas wells in the New Mexico portion of the San Juan Basin.

73.   There are 186 active oil and gas wells on the New Mexico lands.

74.   Four oil and gas bearing sedimentary formations underlie the New Mexico Lands: the Gallup, the Dakota, the Morrison, and the Paradox (from shallowest to deepest).

75.   The Paradox Formation consists of four geologic stages: Barker Creek, Akah, Desert Creek, and Ismay.

76.   Several oil and gas pools which at least partly underlie the New Mexico lands have been established: the Horseshoe Gallup, the Many Rocks Gallup, the Verde Gallup, the Straight Canyon Dakota Gas, the Basin Dakota, the Ute Dome Morrison Gas, the Ute Dome Dakota Gas, the Ute Dome Paradox Gas, the Barker Creek Dakota, the Barker Dome Paradox Gas, the Barker Dome Akah/Upper Barker Creek, the Barker Dome Desert Creek, and the Barker Dome Ismay.

77.   Oil and gas pool names have a geographic component–the name of the field, derived from a geographic location–and a stratigraphic component–the name of the geologic formation that contains the oil or gas.

78.   A pool in one formation may overlie another pool in a deeper formation.

79.   The Horseshoe Gallup pool lies partly under the southwest corner of the New Mexico lands, partly under the Navajo Reservation, and partly under split-estate lands with private surface ownership and federally-owned and BLM-managed subsurface mineral rights.

80.   The Horseshoe Gallup pool has very low production.

81.     There have been no operator conflicts or complaints of drainage on the Horseshoe Gallup pool.

82.     The Many Rocks Gallup pool lies primarily under the Navajo Reservation, but also lies partly under the New Mexico lands.

83.     The Verde Gallup pool lies primarily under the New Mexico lands, but also lies partly to the south of the New Mexico lands under mostly federally-owned lands but also under one and one-half sections of privately-owned lands.

84.     The Straight Canyon-Dakota Gas Pool, which is obsolete, lies entirely under the New Mexico lands.

85.     The Basin Dakota Pool is a San Juan Basin-wide pool for all oil and gas in the Dakota formation that is not in another, more geographically specific Dakota pool.

86.     The Ute Dome Morrison Gas Pool lies entirely under the New Mexico lands.

87.     There is only one exploratory well on the Ute Dome Morrison Gas Pool and no production from that Pool.

88.     The Ute Dome Dakota Gas Pool lies almost entirely under the New Mexico lands, but also underlies two sections with federally-owned subsurface mineral rights, one quarter-section of which is in private surface ownership.

89.     The Ute Dome Paradox Gas Pool lies almost entirely under the New Mexico lands, but also underlies one section of federally-owned (both surface and subsurface) land.

90.     The Barker Creek Dakota Pool and all of the Barker Dome pools lie partly under the New Mexico lands and partly in the State of Colorado; no part of these pools lies in New Mexico outside the New Mexico lands.

11

91.    The Verde Gallup Pool is the only pool that includes private subsurface oil and
       gas rights.

92.    No pool underlies state land or includes state-owned subsurface oil and gas rights.

93.    The Barker Dome and Ute Dome pools account for 85% of the production of natural gas
       on the New Mexico lands.

94.    Oil removed from wells on the New Mexico lands is transported by truck through New
       Mexico to refineries outside the New Mexico lands, including a refinery in Bloomfield,
       New Mexico.

95.    No processing of oil takes place on the New Mexico lands.

96.    Natural gas wells on the New Mexico lands are connected by gathering pipelines to main
       lines that transport the gas to processing plants outside the New Mexico lands, primarily
       to a plant near Kirtland, New Mexico.

97.    There are a few compressor stations for natural gas pipelines on the New Mexico lands.

98.    The only processing of natural gas that takes place on the New Mexico lands is removal
       of condensate, a form of oil.

99.    Natural gas is the primary resource extracted on the New Mexico lands, and oil is
       a secondary resource.

100.   The above mentioned pools were mostly created by NMOCD in the 1940's and 50's, with
       the exception of one or two unitization agreements.

101.   NMOCD initially set the well spacing in the above mentioned pools.

102.   The last change in spacing and setbacks was made in 1995 on the Ute Dome Dakota pool
       after an application by XTO Energy, supported by the UMUT, was approved by
       NMOCD.

*Leasing of Oil and Gas on the New Mexico Lands*

103.   The United States holds title in trust for the UMUT to all subsurface

mineral rights–including oil and gas–on the New Mexico lands.

104.   Operators on the New Mexico lands take title to gas or oil when it is severed (removed

from the ground).

105.   In almost all cases, the UMUT does not own any of the physical facilities or equipment

used to extract oil and gas on the New Mexico lands; however, the UMUT's agreement

with  BIYA Operators, Inc. ("BIYA") is an example of an exception, under which the

operator leases equipment from the UMUT.

106.   Natural gas operators construct, maintain, and own the gathering pipelines that transport

gas to main pipelines outside the New Mexico lands.

107.   Oil operators construct and maintain the roads used to transport oil to refineries outside

the New Mexico lands.

108.   Oil and gas operators construct and maintain the roads used to service oil and gas wells.

109.   There are twelve different oil and gas operators that operate wells on the New Mexico

lands.

110.   All of the oil and gas operators on the New Mexico lands are non-Indian.

111.   The two largest operators–Burlington Resources and XTO Energy–are responsible for

approximately 90% of the natural gas extracted on the New Mexico lands.

112.   Extraction of natural gas on the New Mexico lands is a small percentage of Burlington

Resources' and XTO Energy's total extraction of natural gas in New Mexico.

113.   Although the United States holds title to the natural gas and oil in trust for the UMUT, it

is the UMUT that negotiates and enters into leases with oil and gas operators

13

under the authority of the Indian Mineral Leasing Act of 1938 ("IMLA").

114.   Most of the existing leases on the New Mexico lands were entered into in the 1950's, 60's, and 80's.

115.   The UMUT also negotiates and enters into development agreements with oil and gas operators under the authority of the Indian Mineral Development Act of 1982 ("IMDA").

116.   There are at least three development agreements between the UMUT and an operator: one with Elk San Juan, Inc.; one with BIYA Operators Inc.; and one with Texakoma Oil and Gas Corp.

117.   Typically, in the leases and development agreements the operator is required to be qualified to do business in the State of New Mexico.

118.   Typically, in the leases and development agreements the operator is required to provide worker's compensation to employees of the operator working on the New Mexico lands.

119.   Some development agreements, such as the BIYA agreement, include a forfeiture clause if the operator does not develop the mineral resource.

120.   Some development agreements, such as the Texakoma agreement, include an option for the UMUT to take a working interest in a well after payout.

121.   Some development agreements, such as the Texakoma agreement, cap the combined UMUT tax and royalty revenue at 30%.

122.   Some development agreements, such as the Elk San Juan agreement, provide the UMUT an option to enter into a joint venture with the operator after payout; under the joint venture the UMUT would acquire a working interest, would invest in developing the site, and would have joint control with the BLM over the number and location of wells.

123.   As of the date of trial, the UMUT had not entered into any joint ventures.

124.    Some development agreements, such as the BIYA agreement, give the UMUT control

over the number of wells and their spacing and location.

125.    Leases and agreements are subject to approval by the BIA.

126.    The BIA acts as trustee for the UMUT.

127.    The BIA and the BLM are both subagencies of the Department of Interior.

128.    The UMUT Energy Department works with the BIA on leases and agreements.

129.    BIA authority to approve leases is granted by § 1 of the IMLA, 25 U.S.C. § 396a, and

implemented in regulations at  25 C.F.R. Part 211.

130.    BIA authority to approve agreements is granted by § 3 of the IMDA, 25 U.S.C. § 2102,

and implemented in regulations at  25 C.F.R. Part 225.

131.    The BIA performs site inspections to ensure compliance with lease or agreement terms.

132.    Approval of a lease or agreement by the BIA is a federal action that may fall within the

scope of the National Environmental Policy Act ("NEPA").

133.    The Minerals Management Service ("MMS") in the Department of Interior is responsible

for accounting for royalties on the leases and agreements.

134.    The UMUT Energy Department works with MMS on accounting for royalties and on

audits.

135.    Leases and agreements on the New Mexico lands are not subject to approval by the State

of New Mexico.

*Drilling on the New Mexico Lands*

136.    Before an operator with a lease or agreement for the New Mexico lands can drill, the

operator must first get permission from the BIA to survey the land, including creating

survey roads, and the BIA must then get consent from the UMUT for the survey.

137.   After obtaining UMUT consent for the survey, the BIA informs the BLM that the BIA has approved the survey.

138.   After the operator has completed its survey, the operator submits an Application for Permit to Drill ("APD") to the BLM on a standard BLM form (No. 3160-3) used for all APDs.

139.   The operator must attach to the APD the following: 1) a well plat certified by a registered surveyor; 2) a drilling plan; 3) a surface use plan; 4) a bond to cover operations, unless an existing bond covers the operations; and 5) the operator's certification.

140.   An operator must use surveyors registered by a State.

141.   Operators typically use NMOCD form C-102 for the well plat.

142.   Under federal law, the BLM and BIA share responsibility for approval of an APD; the BLM has final authority, but does not approve an APD until it has received a letter of concurrence from the BIA.

143.   BLM authority over oil and gas operations by lessees is granted by § 4 of the IMLA, 25 U.S.C. § 396d, and implemented by regulations at 43 C.F.R. Part 3160.

144.   BLM authority over oil and gas operations by agreement holders is granted by the IMDA and implemented by regulations at 43 C.F.R. Part 3160.

145.   Under federal law, the BLM is responsible for subsurface ("downhole") issues raised by an APD.

146.   Subsurface issues can include impacts to reservoirs that may be drilled into or through and impacts to groundwater.

147.   Under federal law, the BLM and BIA share responsibility for surface issues raised by an APD.

148.   The BIA is responsible for surface issues related to cultural resources, endangered species, and air and water quality.

149.   The BIA is responsible for granting easements to the oil and gas operators for roads and pipelines.

150.   If a well location proposed in an APD creates a surface issue, the BIA, BLM, and the UMUT consult to resolve the well location issue.

151.   After an APD has been approved, the operator may request a non-standard location if the approved location causes problems due to the topography or geology of the site.

152.   Normally, the operator requests a non-standard location through a sundry notice to the BLM; the BLM then forwards the sundry notice to NMOCD or requires the operator to do so.

153.   On some occasions, an operator on the New Mexico lands has requested approval for a non-standard location from NMOCD.

154.   Representatives of the BIA, BLM, and the UMUT meet yearly to discuss oil and gas operations on the Reservation.

155.   The UMUT Energy Department works with the BIA on surface issues and with the BLM on downhole issues.

156.   As to matters on the New Mexico lands, the BIA has no interaction with NMOCD.

157.   After the BLM approves an APD, it forwards the form to NMOCD.

158.   Once a well is in operation, the operator must provide sundry notices to the BLM as events happen, such as plugging of the well.

159.   The BLM sends copies of the sundry notices to BIA and NMOCD.

160.    Under federal law, disposal of produced water by an operator is subject to approval by the BLM. 43 C.F.R. § 3162.5-1.

161.    When an operator does not want to operate a well any longer, it is the operator's responsibility to plug the well and abandon it and to reclaim the surface.

162.    Under federal law, the operator's plans to plug and abandon a well and to reclaim the surface must be approved by the BLM and/or the BIA.

163.    The BLM has enforcement authority to plug and abandon a well when an operator fails to do so.

164.    The BIA may work with the BLM on a decision to plug and abandon a well.

165.    After an operator has completed reclamation of the surface, the BIA issues a notice of completion to the BLM and the BIA releases the bond it holds for the well.

166.    The BIA has no adjudicative process to resolve disputes between operators.

167.    In general, an action by the BIA is subject to judicial review in federal district court under the Administrative Procedure Act.

168.    The BLM has adjudicative processes to resolve disputes relating to resources over which BLM has oversight, and, in general, an action by a field office of the BLM is subject to administrative review by the corresponding BLM State Director and then by the Department of Interior Board of Land Appeals ("IBLA").

169.    The IBLA often hears cases involving Indian trust responsibilities.

170.    In general, after the IBLA has administratively reviewed an action by a field office of the BLM, the action is subject to judicial review in federal district court under the Administrative Procedure Act.

*Environmental Effects of Oil and Gas Operations*

171.   Unprocessed natural gas, including that found on the New Mexico lands, can contain hydrogen sulfide ($H_2S$).

172.   Hydrogen sulfide is a corrosive and toxic gas.

173.   Hydrogen sulfide can corrode equipment and pipelines.

174.   Hydrogen sulfide can present a threat to human health.

175.   Hydrogen sulfide is heavier than air.

176.   On two occasions, residents of La Plata, New Mexico, a town east of the New Mexico lands, complained to NMOCD about hydrogen sulfide, which originated from stuck valves on the New Mexico lands.

177.   In general, oil and gas operations can cause groundwater contamination.

178.   There is no evidence in the record of actual or potential contamination of groundwater in adjoining private, state, federal, or tribal lands from oil and gas operations on the New Mexico lands.

179.   In general, oil and gas operations disrupt the surface, which may cause environmental effects.

180.   There is no evidence in the record of actual or potential environmental effects on adjoining private, state, federal, or tribal lands from surface disruption on the New Mexico lands.

181.   In general, oil and gas operations can affect wildlife, including endangered or threatened species.

182.   There is no evidence in the record of actual or potential effects on wildlife from oil and gas operations on the New Mexico lands.

19

*Relationship of BLM, NMOCD, and the UMUT*

183.   On June 9, 1995, the BLM issued an order–Ute Mountain Ute No. 1–setting well spacing for wells on Reservation lands extracting natural gas from the Barker Dome Paradox Formation.

184.   The BLM used the hearing processes of NMOCD and the Colorado Oil and Gas Conservation Commission for notification and public hearing on the order for the reasons stated in the order.

185.   The BLM issued the Ute Mountain Ute No. 1 order because there was no "cooperative agreement between the [UMUT], the BLM, [and] the states of Colorado and New Mexico[] governing establishment of spacing on [UMUT] lands."

186.   In the order, the BLM found that the specified well spacing would "prevent the waste of oil and gas," "protect the correlative rights of all parties concerned," and "insure proper and efficient development and promote conservation of the oil and gas resources of the [UMUT]."

187.   The BLM considered "geologic and engineering data" in setting well spacing so that the wells could "efficiently and economically drain the gas and associated hydrocarbons" from the geologic stages in the Paradox Formation.

188.   The BLM approved commingling in some of the wells.

189.   The BLM retained authority to grant permits for non-standard well locations and infill wells.

190.   On October 9, 1996, the BLM issued a second order–Ute Mountain Ute No. 2–setting spacing for wells on Reservation lands extracting oil and gas from the

Ute Dome Dakota Formation.

191. Ute Mountain Ute No. 2 was substantially similar to Ute Mountain Ute No. 1, with the exception that no commingling was approved in Ute Mountain Ute No. 2.

192. In July 1999, the BLM and NMOCD entered into a memorandum of understanding ("MOU") regarding well spacing on Indian lands.

193. BLM's purpose in entering into the MOU was to provide familiar, consistent procedures for oil and gas operators and to avoid duplication of effort by the two agencies.

194. Under the MOU, the BLM adopted the NMOCD standards for well spacing and setbacks as the standards for Indian lands.

195. The BLM also used the NMOCD hearing process for notification and participation in decisions on well spacing matters on Indian lands, including setting of spacing, approval of non-standard well locations, approval of non-standard spacing units, and forced pooling.

196. Under this process, the NMOCD did not issue final binding orders on well spacing matters on Indian lands; instead, NMOCD issued draft orders to be considered by the BLM in making an independent decision based on the record.

197. Under the MOU, when the BLM agreed with NMOCD's draft order, the BLM could issue a final order through a letter of concurrence.

198. Under the MOU, when the BLM differed with NMOCD's draft order, the BLM was required to issue its own order, setting forth "the differences between the ... orders, the reasoning behind those differences, and why the [BLM's] decision [was] consistent with [its] trust responsibilities."

199.    The MOU left in effect all existing decisions of the NMOCD involving Indian
        lands, except those dealt with in Ute Mountain Ute Orders Nos. 1 and 2.

200.    Under the MOU, when a party was adversely affected by the BLM's final order,
        and the matter involved only Indian lands, the party could appeal only to the
        BLM's Colorado or New Mexico State Director and then to the IBLA.

201.    Under the MOU, when a party was adversely affected by the BLM's final order,
        and the matter involved partly Indian and partly non-Indian lands, the party could
        appeal either 1) to the BLM State Director and IBLA, in order to have review of
        the order as applied to Indian lands, or 2) through a BLM hearing using the
        NMOCD process, in order to have review of the order in its entirety.

202.    The MOU expired in July 2004.

203.    Historically, the BLM has generally adopted well spacing and setbacks set by state
        agencies.

204.    In 2008, NMOCD promulgated the "pit rule," regulations for the disposal of waste
        fluids and produced water from oil and gas operations in temporary pits.

205.    In 2009, BLM entered into an MOU with NMOCD adopting the pit rule for federal
        lands and certain tribal lands in New Mexico.

206.    The 2009 MOU did not adopt the pit rule for the New Mexico lands.

207.    Since 1992, the UMUT has barred NMOCD officials and employees from entering
        the New Mexico lands without permission, because the UMUT does not recognize
        the authority of NMOCD over oil and gas on the New Mexico lands; instead, it
        takes the position that authority is shared by the UMUT, the BLM, and the BIA to
        the exclusion of NMOCD.

208.  NMOCD has abided by the UMUT's policy.

209.  On a few occasions, the UMUT has granted permission to NMOCD to enter the
New Mexico lands.

*New Mexico's Taxes on Oil and Gas Operations*

210.  Defendant Rick Homans is the Secretary of the Taxation and Revenue Department of the
State of New Mexico.

211.  The Taxation and Revenue Department of the State of New Mexico collects taxes
imposed by the State.

212.  The State of New Mexico imposes no tax on the UMUT, its real property, or any UMUT
organizations.

213.  The State of New Mexico imposes five taxes on oil and gas operators in the State,
including operators who extract oil and gas on the New Mexico lands: the Oil and Gas
Severance Tax, the Oil and Gas Conservation Tax, the Oil and Gas Emergency School
Tax, the Oil and Gas Ad Valorem Production Tax, and the Oil and Gas Ad Valorem
Production Equipment Tax.

214.  No oil and gas operator, including any operator extracting oil and gas on the New Mexico
lands, is a party to this lawsuit.

215.  The same five taxes, as imposed on non-Indian operators extracting oil and gas on the
Jicarilla Apache Reservation in New Mexico, were at issue in *Cotton Petroleum Corp. v.
New Mexico*, 490 U.S. 163 (1989).

216.  Similar taxes are imposed by the State of Colorado on operators extracting oil and gas
from the portion of the Reservation lying in Colorado.

217.   Four taxes–the Oil and Gas Severance Tax, the Oil and Gas Conservation Tax, the Oil and Gas Emergency School Tax, and the Oil and Gas Ad Valorem Production Tax–are assessed against the taxable value of the oil or natural gas severed.

218.   Severance is the taking from the soil of oil or natural gas in any manner whatsoever.

219.   For three taxes–the Oil and Gas Severance Tax, the Oil and Gas Conservation Tax, and the Oil and Gas Emergency School Tax–the taxable value of oil or natural gas severed is the actual price received by the operator for the oil or natural gas minus royalties to the UMUT and the reasonable expense of getting the oil or natural gas to the first place of market.

220.   The Oil and Gas Severance tax is imposed on oil and natural gas that is severed and sold in the State of New Mexico.

221.   The Oil and Gas Severance tax is assessed at 3.75% of the taxable value of the oil or natural gas severed.

222.   Revenues from the Oil and Gas Severance Tax are partly used to meet the State's debt obligations and partly put into the State's general fund.

223.   The Oil and Gas Conservation Tax is assessed at 0.18 – 0.19% of the taxable value of the oil or natural gas severed.

224.   Revenues from the Oil and Gas Conservation Tax are partly used by the NMOCD to survey and plug abandoned, unplugged or improperly plugged wells and are partly put into the State's general fund.

225.   The Oil and Gas Emergency School Tax is a business privilege tax on operators severing oil and gas in the State.

226.   The Oil and Gas Emergency School Tax is assessed for oil at 3.15% of the taxable value and for natural gas at 4.0% of the taxable value.

227.   Revenues from the Oil and Gas Emergency School Tax are put into the State's general fund.

228.   The Oil and Gas Ad Valorem Production Tax is levied against an assessed value equaling 50% of the product value, at the property tax rate of the corresponding local governmental unit.

229.   Revenues from the Oil and Gas Ad Valorem Production Tax are primarily allocated to local governments.

230.   The Oil and Gas Ad Valorem Production Equipment Tax is imposed on operators' equipment used in the extraction of oil and natural gas.

231.   The Oil and Gas Ad Valorem Production Equipment Tax is levied against an assessed value of the equipment equaling 9% of the product value, at the property tax rate of the corresponding local governmental unit.

232.   Revenues from the Oil and Gas Ad Valorem Production Equipment Tax are primarily allocated to local governments.

233.   For each of the five taxes, the taxable event takes place at least partly on the Reservation.

234.   The State of New Mexico offers a tax credit, the Intergovernmental Production Tax Credit, to operators who extract oil and gas on UMUT lands and who are subject to the four New Mexico severance taxes.

235.   The Intergovernmental Production Tax Credit is 75% of the lesser of the aggregate severance taxes imposed by a Tribe or the aggregate of the four New Mexico severance taxes.

236. The Intergovernmental Production Tax Credit applies only to wells drilled on or after July 1, 1995.

237. The State of New Mexico offers a tax credit, the Intergovernmental Production Equipment Tax Credit, to operators subject to the Oil and Gas Production Equipment Ad Valorem Tax.

238. The Intergovernmental Production Equipment Tax Credit is 75% of the lesser of the amount of any Tribal equipment tax or the amount of the Oil and Gas Production Equipment Ad Valorem Tax.

239. The Intergovernmental Production Equipment Tax Credit applies only to wells drilled on or after July 1, 1995.

240. The UMUT does not impose an oil and gas equipment tax.

241. Because the UMUT does not impose an oil and gas equipment tax, the operators who extract oil and gas on the New Mexico lands do not receive the Intergovernmental Production Equipment Tax Credit.

242. The net effect of the New Mexico tax credits has been an average reduction (over the years 1999-2007) of approximately 1.14% in the yearly aggregate tax rate of the five New Mexico taxes on operators extracting oil and gas on the New Mexico lands; the reduction is increasing as new wells come into production and old wells are shut down.

243. Under the Intergovernmental Production Tax Credit, if the UMUT increases its taxes on operators extracting oil and natural gas from the New Mexico lands, the State of New Mexico credit to those operators will be reduced by the amount of the UMUT tax increase on wells drilled on or after July 1, 1995. NMSA 1978 § 7-29C-1(F).

244.  If the State of New Mexico is barred from imposing the five taxes on oil and gas operators on the New Mexico lands, the Intergovernmental Production Tax Credit and the Intergovernmental Production Equipment Tax credit lose all value to the operators, as the credits are specifically applied against the five taxes as levied on wells on the New Mexico lands drilled on or after July 1, 1995.

*New Mexico's Services to the UMUT, Its Members, and Oil and Gas Operators*

245.  The State of New Mexico provides no physical services or infrastructure on the New Mexico lands to the UMUT, its members, or the oil and gas operators.

246.  The UMUT is an intervener in a New Mexico state court case involving the general adjudication of water rights in the San Juan River Basin, *State of New Mexico ex rel. Reynolds v. United States et al.*, Civ. No. 75-184-1.

247.  Using revenues from the Oil and Gas Conservation tax, NMOCD offers the service of plugging abandoned wells on the New Mexico lands, but NMOCD has never actually plugged an abandoned well on the New Mexico lands.

248.  Other than opening its courts to the UMUT and offering plugging of abandoned wells, New Mexico provides no services directly to the UMUT.

249.  There is no evidence in the record that members of the UMUT make use of services provided by New Mexico off the New Mexico lands.

250.  The services New Mexico provides to oil and gas operators on the New Mexico lands are the following: a hearing process for resolving disputes between operators, publicly available geologic records, publicly available production records, and records of sales and transfers. NMOCD also offers–but the UMUT does not make use of–environmental cleanup and site inspection.

251.   Because it is in New Mexico's governmental interest to do so,  New Mexico would continue to provide these services to the operators extracting oil and gas on the New Mexico lands even if the State were not able to impose the five taxes on them.

252.   There is no evidence that the NMOCD hearing process has been used to resolve a dispute between operators concerning extraction on the New Mexico lands.

253.   The NMOCD administrative and hearing orders regarding wells on the New Mexico lands have approved requests for non-standard locations and commingling.

254.   There is no evidence that the operators who extract oil and gas on the New Mexico lands make use of the publicly available geologic records or the publicly available production records.

255.   The NMOCD budget for the 2007 fiscal year was $11,132,531.00.

256.   There are 50,225 active oil and gas wells in the State of New Mexico.

257.   The average expenditure statewide by NMOCD on an active well in 2007 was approximately $221.65.

258.   It is not possible to separately determine NMOCD expenditures for wells on the New Mexico lands.

259.   The only expenditure that can be identified for a particular well is an expense for plugging that well; NMOCD has not plugged a well on the New Mexico lands since 1992, and there is no evidence it plugged a well on the New Mexico lands before then.

260.   After operators take title to oil produced on the New Mexico lands by severing it, they transport the oil to refineries on roads in New Mexico which are constructed and maintained by the State of New Mexico.

261.  After operators take title to gas produced on the New Mexico lands by severing it, they transport the gas through gathering pipelines in the New Mexico lands to main lines in New Mexico.

262.  Without an off-reservation infrastructure in New Mexico to transport oil and gas, the economic value of the oil and gas produced on the New Mexico lands would be substantially less.

263.  The State provides substantial services by regulating the off-reservation infrastructure that makes transport of oil and gas possible.

264.  The economic value to the UMUT of services provided by the State of New Mexico on the New Mexico lands to oil and gas operators is *de minimis*.

265.  The economic value to the UMUT of services provided by the State of New Mexico off the New Mexico lands to oil and gas operators is substantial.

*The UMUT's Royalties and Taxes on Oil and Gas Operations*

266.  The UMUT receives a royalty from all operators extracting oil and gas from the New Mexico lands.

267.  The royalty is assessed based on the wellhead value of the oil or gas.

268.  The percentage of the royalty is specified in the lease or agreement.

269.  On average, the UMUT receives 13.1% of the wellhead value in royalties.

270.  Royalties received by the UMUT are distributed to enrolled members of the UMUT on a per-capita basis.

271.  Total UMUT royalties in 2007 were $4,426,741.00, almost all of which came from the New Mexico lands; only a small part came from wells in Colorado.

272.    Since 1987, the UMUT has imposed a tax on possessory interests in UMUT lands, including leases and agreements.

273.    Oil and gas lessees and agreement holders are subject to the possessory interest tax.

274.    The UMUT possessory interest tax is assessed at the rate of 6% of the market value of the lease or agreement, including improvements and equipment on the lease parcel.

275.    Revenues from the UMUT possessory interest tax are used to defray the costs of providing essential UMUT governmental services and for other UMUT governmental purposes. Ute Mountain Ute Tribe Ordinance No. 3334 § 18, Nov. 24, 1987.

276.    Since 1983, the UMUT has imposed a severance tax on oil and gas operators on the New Mexico lands.

277.    The UMUT severance tax is assessed at the rate of 5% of the wellhead value of the oil or gas severed on the New Mexico lands and sold or transported off the Reservation.

278.    Revenues from the UMUT severance tax are used to defray the costs of providing essential UMUT governmental services and for other UMUT governmental purposes. Ute Mountain Ute Tribe Ordinance No. 3659 § 22, Apr. 6, 1990; Ute Mountain Ute Severance Tax Ordinance § 10, Apr. 20, 1983 (severance tax fund monies to be transferred to general fund).

279.    The net effect of the UMUT severance tax and the UMUT possessory interest tax has been, on average, a 9.5% tax on the gross wellhead value of oil and gas extracted on the New Mexico lands.

*Economics of the State and UMUT Taxes*

280.    The UMUT has no economic ability to affect the market price of oil or natural gas.

281.   The oil and gas operators have no economic ability to affect the market price of oil or natural gas.

282.   The operators are free to choose to extract oil and gas outside the New Mexico lands.

283.   The UMUT is free to negotiate leases or agreements with other oil and gas operators.

284.   The three development agreements–Elk San Juan, BIYA, and Texakoma–were negotiated in the last five years (2004 – 2008); during negotiations, the operators were aware that New Mexico would impose the five taxes on them.

285.   To the extent that they can do so without making other operators more attractive to the UMUT, the operators who negotiate leases and agreements with the UMUT take into account the cost of the five New Mexico taxes in reaching terms with the UMUT.

286.   The leases and agreements do not directly pass the cost of the five New Mexico taxes on to the UMUT.

287.   The UMUT has resolved that, in the event the five New Mexico taxes are found unlawful, the UMUT severance tax will be increased by the amount of the five New Mexico taxes. Ute Mountain Ute Tribal Council Resolution No. 3874, Feb. 13, 1992.

288.   Unless specifically surrendered in unmistakable terms in an existing lease or agreement, the UMUT has the authority to increase severance taxes on existing leases and agreements it has entered into with operators, or to enact a third UMUT tax, regardless of the status of New Mexico taxes. *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982).

289.   The only leases or agreements under which the UMUT has surrendered–at least to an extent–its authority to increase severance taxes are the recent agreements that cap UMUT revenues at 30%.

290.   Even in agreements that specifically and unmistakably cap total UMUT revenues from an operator at 30%, UMUT revenues in those agreements are currently substantially below 30% and an increase of UMUT revenue to 30% would be significant.

291.   The operators with existing leases or agreements have no preference between being taxed an equal amount by the State or by the UMUT and would continue to extract oil and gas from the New Mexico lands if the New Mexico taxes were replaced by equivalent UMUT taxes.

292.   If the five New Mexico taxes were found unlawful, the UMUT would have the options of: 1) implementing UMUT Council Resolution No. 3874 and increasing the severance tax as stated in the Resolution; or 2) rescinding Resolution No. 3874; or 3) increasing the severance tax, but not to the extent stated in Resolution No. 3874.

293.   For the years 2002 – 2007, the aggregate of the five New Mexico taxes totaled $8,052,449, an average of $1,342,074.83 per year.

294.   The total wellhead value of all oil and gas extracted on the New Mexico lands has not changed significantly since the UMUT started entering into development agreements.

295.   Total UMUT revenue from development agreements, including those agreements which cap UMUT revenue at 30%, is not a substantial part of UMUT revenue from oil and gas development.

296.   The much greater part of UMUT revenue comes from leases without any cap on UMUT revenues.

297.   In the event that the UMUT implemented Resolution No. 3874–and the market for oil and gas remained stable–the UMUT would receive at least $1,300,000 per year in additional revenue from the severance tax, an increase of approximately $650 per enrolled UMUT member per year.

298. In the event that the UMUT rescinded Resolution No. 3874, oil and gas production on the New Mexico lands would become more attractive to oil and gas operators relative to oil and gas production elsewhere in New Mexico.

299. Oil and gas operators could seek to increase production on the New Mexico lands by discovering new sources of oil and gas on the New Mexico lands, by drilling infill wells on existing pools, or by bringing back into production wells that are not profitable under the current taxes.

300. Increased production through discovery of new sources of oil and gas on the New Mexico lands would increase UMUT revenue from royalties and the current taxes.

301. Increased production through infill or reopening of closed wells on pools that lie entirely or almost entirely within the New Mexico lands would increase UMUT revenue from royalties and the current taxes.

302. Increased production through infill or reopening of closed wells on pools that lie substantially outside the New Mexico lands would have an unpredictable outcome for UMUT revenue, due to the creation of an incentive to operators outside the New Mexico lands to increase their production correspondingly.

303. There is insufficient evidence to quantify the return to the UMUT if it were to rescind Resolution No. 3874.

304. Total UMUT revenue for 2007 was $16,052,092.00.

305. The average per capita income of UMUT members at the time of the 2000 census was $8,159.

306. The average per capita incomes at the time of the 2000 census at corresponding state and county levels were as follows: $17, 261 for New Mexico in general, $14,282 for residents

of San Juan County, New Mexico, $24,049 for Colorado in general, and $17,003 for residents of Montezuma County, Colorado.

307. The unemployment rate of UMUT members at the time of the 2000 census was 11.3%; the rate at the corresponding state and county levels ranged from 2.7% to 5.5%.

308. The percentage of UMUT families living below the poverty level at the time of the 2000 census was 38.5%; the percentage at the corresponding state and county levels ranged from 10.2% to 18%.

309. If the five New Mexico taxes were replaced by an equivalent UMUT severance tax, UMUT governmental services or UMUT distributions to members would be increased by at least $650 per year per member, an increase of almost 8% of the average per capita income of UMUT members.

310. The five New Mexico taxes impose an economic burden on the UMUT and its members, the extent of which is laid out above in these Findings of Fact.

311. There is no record evidence that the imposition of the five New Mexico taxes substantially interferes with the UMUT's ability to govern itself.

## CONCLUSIONS OF LAW AND MEMORANDUM OPINION

To decide this case, the Court must first review the law governing state taxation of activities on tribal lands and the law governing leasing and development of tribal oil and gas resources. The Court initially notes that jurisdiction is proper: "a suit by an Indian tribe to enjoin the enforcement of state tax laws is cognizable in [] district court under [28 U.S.C.] § 1362 despite the general ban in 28 U.S.C. § 1341 against seeking federal injunctions of such laws." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 762 n.2 (1985).

*State Taxation of Tribal Activities*

Stated most simply, the issue presented here is whether the State of New Mexico may assert jurisdiction to tax non-Indians engaged in transactions with the UMUT on the part of the Reservation that lies in New Mexico. In 1832, the Supreme Court announced a clear rule: States had no jurisdiction at all within the boundaries of a reservation.   *Worcester v. Georgia*, 6 Pet. 515, 561 (1832) (Marshall, J.); *see also The Kansas Indians*, 72 U.S. 737 (1867) (state has no power to tax Indian lands); *The New York Indians*, 72 U.S. 761 (1867) (same). One hundred and twenty-seven years later, after "adjust[ing] [the rule] to take account of the State's legitimate interest in regulating the affairs of non-Indians," the Court articulated a new standard: "[A]bsent governing Acts by Congress, the question [is] whether the state action infringe[s] on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 220 (1959). Thus, Congress may expressly authorize state jurisdiction; but if Congress has not, tribal sovereignty predominates the analysis of whether the state may assert jurisdiction. *See id.* at 222.

The Supreme Court subsequently developed a second, more nuanced preemption-based approach to questions of state jurisdiction in Indian country. *McClanahan*, 411 U.S. at 172. The approach is unlike that for standard federal-state preemption. *Compare Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203-04 (1983)(describing the three traditional approaches to federal-state preemption analysis) *with White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980)(recognizing the different approach to tribal preemption and finding that application of traditional federal-state preemption principles is unhelpful in the tribal context). For example, tribal sovereignty is "a backdrop against which the

applicable treaties and federal statutes must be read."[1] *Id.* In *McClanahan*, a Navajo Indian

"whose entire income derive[d] from reservation resources" challenged application of Arizona's

state income tax to her. *Id.* at 165. Instead of evaluating the tax's effect on "Platonic notions of

tribal sovereignty," the Court examined federal law–the United States' 1868 treaty with the

Navajo Nation, the Arizona Enabling Act, the Buck Act, and Public Law 280–with the backdrop

of tribal sovereignty in mind. *Id.* at 174-78. Although federal law neither expressly allowed nor

prohibited Arizona's taxation, when that law was interpreted under the canon that ambiguities in

treaties and federal statutes are to be resolved in favor of tribes, no authority remained for

Arizona to impose its taxes. *See id.* The "backdrop of tribal sovereignty" acted essentially as a

thumb on the scales in favor of the Navajo Nation.  *See also Warren Trading Post Co. v. Ariz.*

*State Tax Comm'n*, 380 U.S. 685 (1965) (preemptive effect of federal regulation of Indian traders

on state tax).

Similarly, in  *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), the Supreme

Court considered state taxation of non-Indians engaged in activities on a reservation.  A non-

Indian logging company had contracted with a White Mountain Apache tribal enterprise to log

timber on the White Mountain Apache Reservation and transport it to the tribal enterprise's mill.

*Id.* at 138-39. Tribal timber operations as a whole "accounted for over 90% of the Tribe's total

annual profits." *Id.* at 138. The company operated its logging trucks entirely within the

reservation, partly on state roads and partly on BIA and tribal roads.  *Id.* at 139-40. Because its

activities were limited to the reservation, the company challenged the State of Arizona's

---

[1]  Although the Defendant has cited to cases recognizing the different tribal preemption analysis, Defendant failed to discuss the important consideration of the "backdrop of tribal sovereignty," and instead focused on the federal-state relationship.  This oversight leads the Court to believe that Defendant misapprehends the nature of the preemption analysis applicable in this case and thus, did not accord importance to the UMUT's sovereignty in making its arguments.

imposition of its motor carrier license tax and its excise fuel tax on the company. *Id.* at 140. The company conceded that it was liable for a *pro rata* share of the tax in proportion to its use of state roads, but contested any tax for its use of BIA and tribal roads. *Id.*

As in *McClanahan*, the Supreme Court rejected an approach based in "mechanical or absolute conceptions of state or tribal sovereignty." *Id.* at 145. Instead, to determine whether "a State [may] assert[] authority over the conduct of non-Indians engaging in activity on [a] reservation," a court must make "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Id.* at 144-45. In so doing, "traditional notions of Indian self-government ... provide an important 'backdrop' against which vague or ambiguous federal enactments must always be measured." *Id.* at 144 (citing *McClanahan*, 411 U.S. at 172).

In applying that standard, the Supreme Court then looked to the three interests at stake: the federal interest in reservation timber and roads, the Tribe's interest in making use of its timber, and Arizona's interest in taxing the company's activities. The Supreme Court found that logging on the reservation and use of the BIA and tribal roads were governed by comprehensive federal regulations, *Bracker, 448 U.S.* at 146-48, that the economic burden of the state tax on the Tribe would interfere with the federal objective of providing the Tribe with the benefit of its timber resources and with "the Tribe's ability to comply with the sustained-yield management policies imposed by federal law," *id.* at 149-50, and that Arizona's interest was nothing more than "a general desire to raise revenue" without providing any relevant service to the Tribe, *id.* at 150. As a result, the balance of interests favored preemption of Arizona's taxes. *Id.* at 152. The Supreme Court noted that an economic burden on the Tribe, standing alone, would not suffice to invalidate the taxes. *Id.* at 151 n.15. However, even a small burden–as noted by the dissent, "$5,000-$6,000 or less than 1% of the total annual profits"–was unacceptable in these circumstances. *Id.* at 149-50; *id.* at 159 (Stevens, J., dissenting).

In its first application of *Bracker* balancing, the Supreme Court struck down New Mexico's imposition of a tax "on the gross receipts that a non-Indian construction company receive[d] from a [T]ribal school board for the construction of a school for Indian children on the reservation." *Ramah Navajo School Bd. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 834 (1982). The Tribal school board had solicited competitive bids for the project, and the bidders "included the state gross receipts tax as a cost of construction in their bids." *Id.* at 835. Thus, the tax imposed an indirect burden on the board. *Id.* at 836. As in *Bracker*, "[f]ederal regulation of the construction and financing of Indian educational institutions [wa]s both comprehensive and pervasive." *Id.* at 839. Furthermore, New Mexico did not assist in any way in "provid[ing] adequate educational facilities for [the Tribe's] children" and therefore lacked "any specific, legitimate regulatory interest to justify the imposition of its gross receipts tax." *Id.* at 843, 844 n.7. Services the State provided to the construction company off the reservation failed as a justification for the state tax for two reasons. First, off-reservation services could not justify imposing a burden on the Tribe for its activities on the reservation. *Id.* at 844. Second, "the state tax revenues derived from the [construction company's] off-reservation business activities [we]re [presumably] adequate to reimburse the State for the services it provide[d] to [the company]." *Id.* at 844 n.9. Furthermore, services provided by the State to the Tribe but unrelated to construction of schools could not be considered part of the analysis. *Id.* at 845 n.10. Consequently, "[t]he State's ultimate justification for imposing this tax amount[ed] to nothing more than a general desire to increase revenues," an insufficient justification for burdening the "comprehensive federal scheme regulating the creation and maintenance of educational opportunities for Indian children and on the express federal policy of encouraging Indian self-sufficiency in the area of education." *Id.* at 845.

In a separate line of cases, the United States Supreme Court upheld State taxes on sales of cigarettes within a reservation to non-Indians. *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463 (1976); *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134 (1980). In *Colville*, the Supreme Court rejected a Tribe's argument that the imposition of State taxes would impair the Tribe's ability to impose its own taxes on cigarettes. *Id.* at 154. The Supreme Court reasoned, "the value marketed by the smokeshops to persons coming from outside is not generated on the reservations by activities in which the Tribes have a significant interest." *Id.* at 155.Thus, the taxes did not "infringe the right of reservation Indians to 'make their own laws and be ruled by them'." *Id.* at 156 (quoting *Williams v. Lee*, 358 U.S. at 220). Moreover, federal law, "even when given the broadest reading to which [it is] fairly susceptible, [could not] be said to pre-empt Washington's sales and cigarette taxes."  *Colville, 447 U.S.* at 155.

In a subsequent case outside the taxation context, the Supreme Court distinguished the *Moe/Colville* line of cases. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324 (1983).  In *Mescalero Apache Tribe,* the Supreme Court considered whether the State of New Mexico could assert concurrent jurisdiction with the Mescalero Apache Tribe over non-Indians hunting and fishing on the Mescalero Apache Reservation. *Id.* at 325, 336-37. The Supreme Court first reasoned that, due to the State's general powers over non-Indians within its borders, "[c]oncurrent jurisdiction would empower New Mexico wholly to supplant" the Tribe's regulation of hunting and fishing.  *Id.* at 338.  Consequently, hunting and fishing would take place under two potentially inconsistent schemes that would make it difficult for the Tribe to manage its resources.  *Id.* at 339-40. This difficulty would "threaten to disrupt the federal and tribal regulatory scheme, [and] also threaten Congress' overriding objective of encouraging tribal

self-government and economic development." *Id.* at 341. The Tribe's economic development of

its natural resources was "far removed from those situations, such as on-reservation sales outlets

which market to nonmembers goods not manufactured by the tribe or its members, in which the

tribal contribution to an enterprise is *de minimis*." *Id.* (citing *Colville*, 477 U.S. at 154-59). "The

Tribal enterprise in this case clearly involve[d] 'value generated on the reservation by activities

involving the Tribe'." *Id.* (quoting *Colville*, 477 U.S. at 156-57).

On the other hand, "[t]he State [] failed to identify 'any regulatory function or service that

would justify' the assertion of concurrent regulatory authority." *Mescalero Apache Tribe,* 462

U.S. at 341 (quoting *Bracker*, 448 U.S. at 148).  The Supreme Court noted that, for example, if

the State had shown that game migrated and caused specific effects off the reservation but within

the State, that could justify regulation by the State.  *Mescalero Apache Tribe,* 462 U.S. at 342

(citing *Puyallup Tribe v. Wash. Game Dept.*, 433 U.S. 165, 174 (1977)). Nor could the State show

it contributed to the activity the State wanted to control: "The fish and wildlife resources are

either native to the reservation or were created by the joint efforts of the Tribe and the Federal

Government." *Mescalero Apache Tribe*, 462 U.S. at 342. Thus, the only interest the State had

was in collecting funds derived from the sale of hunting and fishing licenses, an interest

insufficient to avoid preemption of its authority.  *Id.* at 342-43.

More recently, the Supreme Court has attempted to lay down bright-line rules for when

*Bracker* balancing is appropriate in taxation cases. The rules depend on the "who" and "where":

who is taxed and where that person is taxed. *Wagnon v. Prairie Band Potawatomi Nation*, 546

U.S. 95, 100 (2005). First, a court must determine on whom the legal incidence of the tax falls.

*Okla. Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995). The legal incidence does not

necessarily fall on the entity bearing the economic burden of the tax,  *id.* at 459-60; instead, it is

determined by who has the legal obligation to pay under "a fair interpretation of the taxing statute

as written and applied." *Cal. State Bd. of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9,

11 (1985) (per curiam). Second, a court must determine where the "taxable event" occurs.

*Wagnon*, 546 U.S. at 107. If the legal incidence of the tax falls on an Indian person or entity and

the taxable event occurs on the reservation, then there is a categorical bar: the tax is invalid unless

Congress has expressly given the State authority to tax. *Chickasaw Nation*, 515 U.S. at 459. If the

legal incidence falls on a non-Indian person or entity and the taxable event occurs on the

reservation, then *Bracker* balancing applies. *Wagnon*, 546 U.S. at 112. Finally, if the taxable

event occurs off the reservation, there is no balancing and traditional rules of federal preemption

apply.   *Id.*

Here, it is undisputed that the legal incidence of the New Mexico taxes fall on the oil and

gas operators, who are non-Indian. Four of the taxes are imposed when the oil or gas is "severed

and sold," while one is imposed when it is merely "severed."   *Wagnon* is silent as to the test to be

applied when the taxable event is a compound one, one part of which may take place on a

reservation and the other off.[2]   However, Defendant has not contested the application of *Bracker*

balancing to oil and gas that is severed on the New Mexico lands but sold off of the lands in New

Mexico. Furthermore, the record does not indicate where the oil and gas is sold, but it makes clear

that the gas is severed on the New Mexico lands.  Given these circumstances, the Court

determines that under the *Wagnon* test, *Bracker* balancing applies.

### *Indian Mineral Leasing Statutes*

There are two types of oil and gas leases at issue in this case. The first leases were

executed under the Indian Mineral Leasing Act of 1938. The second leases were executed under

---

[2] In *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982), the Supreme Court held that, for a *tribal* severance tax assessed on resources severed on the reservation and "sold or transported off the reservation," the taxable event occurred on the reservation, because the tax became due at the time of severance. *Id.* at 156 n.22.

the Indian Mineral Development Act of 1982. In addition, the "historical backdrop" of Indian

mineral leasing plays a part in the analysis and is therefore reviewed.

In 1891, Congress authorized mineral leasing on lands "bought and paid for" by Indians.

Act of Feb. 28, 1891, c. 383, § 3, 26 Stat. 795 (codified at 25 U.S.C. § 397). "Bought and paid

for" lands were held to include treaty reservations, under the reasoning that such lands were

"bought" by Indians through "surrender of other lands." *Strawberry Valley Cattle Co. v.

Chipman*, 45 P. 348 (Utah 1896); *accord* 25 Pub. Lands Dec. 408 (Nov. 17, 1897); *British-

American Oil Producing Co. v. Bd. of Equalization of Mont.*, 299 U.S. 159 (1936). In 1924,

Congress authorized the Secretary of Interior, with approval from the appropriate tribal council,

to auction mineral leases on "unallotted land on Indian reservations . . . subject to lease for

mining purposes for a period of ten years under [the 1891 Act]." Act of May 29, 1924, ch. 210, 43

Stat. 244 (codified at 25 U.S.C. § 398). In addition, the 1924 Act authorized states to tax

"production of oil and gas ... on such lands." *Id.* Because it was unclear whether the 1891 Act

applied to executive reservations–reservations created by Executive Order, not by treaty nor Act

of Congress–it was equally unclear whether the 1924 Act applied to them. Congress resolved the

ambiguity with the Indian Oil Act of 1927, which provided express authority for leases on

executive reservations and state taxation of oil and gas revenues generated under those leases.

Indian Oil Act of 1927, 44 Stat. 1347 (codified at 25 U.S.C. § 398a).

In *British-American Oil Producing*, a non-Indian-owned company with an oil and gas

lease on the Blackfeet Reservation sued to invalidate a gross production tax and net proceeds tax

imposed by Montana.  *British-American Oil Producing*, 299 U.S. at 161. The company argued

that the lease, approved by the Secretary of Interior in 1934, was executed under a 1919 Act

specifically authorizing the Secretary to lease minerals on the Reservation and therefore not

subject to the taxation provision in the 1924 Act. The Supreme Court first noted that the Blackfeet Reservation was not an executive reservation and therefore the 1924 Act was potentially applicable. *Id.* at 162-63.  The Supreme Court then harmonized the 1919 and 1924 Acts, holding that the lease was subject to both the specific provisions in the 1919 Act and the general provisions in the 1924 Act. *Id.* at 165-66. As a result, the Supreme Court held that the lease was subject to Montana's taxes. *Id.* at 166.

In 1938, two years after the Supreme Court decided *British-American Oil Producing*, Congress passed the Indian Mineral Leasing Act ("IMLA"). Indian Mineral Leasing Act of 1938, ch. 198, 52 Stat. 347 (codified at 25 U.S.C. §§ 396a-396g). In enacting the IMLA, Congress had three goals: creating uniform law for mineral leases on tribal land; "bring[ing] all mineral-leasing matters in harmony with the Indian Reorganization Act," and "ensur[ing] that the Indians receive the greatest return from their property." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 767 n.5 (1985).

In *Blackfeet Tribe*, Montana had imposed severance taxes on the "Blackfeet Tribe's royalty interest in oil and gas leases issued [under the IMLA] to non-Indian lessees" on unallotted lands within the Tribe's reservation.  *Id.* at 761. The taxes were assessed on the pre-royalty value of production and were paid by the non-Indian lessees, who then deducted those fees from the royalties they paid to the tribe.   *Id.* at 761. Montana argued that the 1924 Act remained in force and authorized the taxes, even on leases executed under the IMLA. *Id.* at 765. The IMLA was silent as to state taxation; however, it contained a general repealer clause stating, "All Act[s] or parts of Acts inconsistent herewith are hereby repealed." *Id.* at 764, 766-67.

In analyzing the IMLA, the Supreme Court applied two canons of Indian law. "[F]irst, the States may tax Indians only when Congress has manifested clearly its consent to such taxation."

*Id.* at 766.[3] "[S]econd, statutes are to be construed liberally in favor of the Indians, with ambiguous provision interpreted to their benefit." *Id.*  The Supreme Court noted that the IMLA "contain[ed] no explicit consent to state taxation" and "no indication that Congress intended to incorporate implicitly in the [IMLA] the taxing authority of the 1924 Act." *Id.* at 766-67. Under the two canons, "the general repealer clause of the [IMLA] [could not] be taken to incorporate" the taxation provision of the 1924 Act, even if the taxation provision were consistent with the IMLA.  *Id.* at 767. Furthermore, "even applying ordinary principles of statutory construction," the taxation provision of the 1924 Act explicitly appliepd solely to leases executed under the 1891 Act and therefore not to leases executed under the IMLA.  *See id.* The Supreme Court ended by stating: "When the statute is liberally construed in favor of the Indians, it is clear that if the tax proviso survives at all, it reaches only those leases executed under the 1891 Act and its 1924 amendment." *Id.*

Oil and gas leases executed under the IMLA by the Jicarilla Apache Tribe have been the subject of two United States Supreme Court cases. In the first—less central but still important to this case—the Supreme Court held that the Jicarilla Tribe had the inherent power to impose severance taxes on those leases, even though it was also the lessor.  *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130 (1982). In so doing, the Supreme Court dismissed New Mexico's argument that the Indian Oil Act of 1927–which applied because the Jicarilla Apache's home is an executive reservation–divested the Tribe of their power to tax. *Id.* at 150-51.  Hence, the Supreme Court did not reach an issue raised by the Tribe: whether the IMLA repealed the authority granted in the 1927 Act to tax oil and gas operations on executive reservations. *Id.* at 151 n.17.  The

---

[3]   The Court's opinion did not mention that the pass-through of the severance taxes to the Tribe was provided for not in the leases but by the Montana statutes imposing the taxes.  *Blackfeet Tribe of Indians v. State of Mont.*, 507 F. Supp. 446, 448 (D. Mont. 1981). Thus, under "a fair interpretation of the taxing statute as written and applied," the legal incidence fell on the Tribe.

Supreme Court also rejected the State's position that the taxes violated the dormant Commerce Clause. *Id.* at 153-58.  The State argued that the imposition of tribal taxes on top of the State's taxes created a multiple taxation issue.  The Supreme Court noted that there was no doubt that the Tribal taxes were within the scope of what the Tribe's contact with the activity could justify: after all, the mining took place on the reservation. *Id.* at 158 n.6.  The Supreme Court then speculated that, on the other hand, New Mexico's taxes might be vulnerable to a similar objection if they were heavier "than the State's contact with the activity would justify." *Id.*

In the second United States Supreme Court decision—central to this case—the Supreme Court reached the issue it deferred in *Merrion*.  *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989). In *Cotton Petroleum*, a non-Indian oil and gas holder of IMLA leases operating on the Jicarilla Apache Reservation sued in state district court to challenge New Mexico's severance taxes. Taking a cue from *Merrion*, the lessee "contended that state taxes imposed on reservation activity are only valid if related to actual expenditures by the State in relation to the activity being taxed." *Id.* at 170. The lessee "presented evidence at trial ... that the amount of tax it paid to the State far exceeded the value of services that the State provided to it and that the taxes paid by all nonmember oil producers far exceeded the value of services provided to the reservation as a whole." *Id.* The lessee "did not, however, attempt to prove that the state taxes imposed any burden on the Tribe." *Id.*   Notably, the Jicarilla Tribe was not a party to the suit, although it did file an amicus brief arguing that the taxes imposed economic burdens on it. *See id.* App. to Juris. Statement 14-15 ¶¶ 1, 10 (findings of fact of state district court). The lessee also claimed that the state taxes violated its right to due process and were preempted by federal law. 490 U.S. at 170.

In reaching its decision, the state district court made a number of factual findings eventually important in the United States Supreme Court's opinion. The district court found, "No economic burden falls on the tribe by virtue of the state taxes." *Id.* App. to Juris. Statement at 15 ¶ 10. More specifically, in the state district court's view, the taxes did not affect the Jicarilla Tribe's ability to impose its own severance and privilege taxes and did not affect production of oil and gas. *Id.* at 16-17 ¶¶ 18, 19. The state district court also found that "New Mexico provides substantial services to both" the Jicarilla Tribe and the lessee, including "the benefits of living in an organized society." The state district court valued "[t]he amount of state expenditures on the reservation" at "approximately three million dollars per year." *Id.* at 16 ¶ 12. Finally, the state district court found that NMOCD "regulate[d] spacing and mechanical integrity of wells located on the Jicarilla Reservation as it d[id] all other wells within the state." *Id.* ¶ 17. The state district court then rejected the lessee's preemption, commerce clause, and due process clause challenges. *Id.* at 17-19. The New Mexico Court of Appeals affirmed the state district court's decision and the New Mexico Supreme Court eventually declined to review the case. 490 U.S. at 172-73.

The United States Supreme Court in *Cotton Petroleum* first framed the preemption question as "whether Congress has acted to grant the Tribe [] immunity [to the State's taxation], either expressly or by plain implication." *Id.* at 174-75. The Supreme Court then examined the purposes of the IMLA and decided that Congress intended to "provide Indian tribes with badly needed revenue" but did not "intend[] to remove all barriers to profit maximization." *Id.* at 178-79. Legislative language, cited by the Supreme Court in *Blackfeet Tribe*, stating that the Act sought to give Tribes "the greatest return from their property," had to be understood in context: Congress wanted to free Tribal leases from certain disadvantages they suffered relative to leases on public lands and put the Tribal leases on equal footing. *Id.* As there was no doubt at the time

of enactment of the IMLA that leases on public lands were subject to state taxation, the Supreme Court inferred that Congress would have understood Tribal leases to be equally subject to state taxation. *Id.*

To this point in its *Cotton Petroleum* opinion, the Supreme Court had engaged in standard statutory interpretation. It then recalled the *McClanahan* precept that such interpretation should be conducted against a historical "backdrop" of tribal sovereignty. The Supreme Court chose to view this precept not as a thumb on the scales in favor of the Tribe, but rather as an invitation to review the history of state taxation of oil and gas leases on executive reservations. *Id.* at 180-82; *see also Bracker*, 448 U.S. at 145 n.12 (reviewing history of Indian timber rights); *Ramah*, 458 U.S. at 839-40 (reviewing history of federal concern for education of Indian children). As there was no authority for oil and gas leasing on executive reservations until enactment of the Indian Oil Act of 1927, which also authorized state taxation, "at least as to Executive Order reservations, state taxation of nonmember oil and gas lessees was the norm from the very start." *Id.* at 182. "There [was], accordingly, simply no history of tribal independence from state taxation of these lessees to form a 'backdrop' against which the 1938 Act must be read." *Id.*

The Supreme Court then considered whether the general repealer clause in the IMLA applied to repeal the express grant of authority to tax in the 1927 Act. *Id.* The Supreme Court noted that its doctrine of intergovernmental tax immunity, in force in 1927, had been overruled by 1938. *Id.* Thus, it was not necessary for Congress in 1938 to expressly permit state taxation. *Id.* Therefore, an implied Congressional intent to allow state taxation in the IMLA was not inconsistent with its express grant of the right of state taxation in the Indian Oil Act of 1927.[4] *Id.* at 182-83.

---

[4]   Peculiarly, the United States Supreme Court stated that its decision in *Blackfeet Tribe* was not to the contrary. *Id.* at 183 n.14. At issue in *Blackfeet Tribe* was the interaction of the IMLA with the 1924 Act, not with the Indian Oil Act of 1927, as the *Cotton Petroleum* opinion stated. *Blackfeet Tribe*, 471 U.S. at 763. The distinction matters here.

Next, the Supreme Court in *Cotton Petroleum* turned to the *Bracker* analysis. Based on the factual findings of the state district court, the Supreme Court distinguished *Bracker* and *Ramah*. Both *Bracker* and *Ramah* "involved complete abdication or noninvolvement of the State in the on-reservation activity." *Id.* at 185. In both cases, the economic burden of the tax fell on the Tribes. *Id.* And in both cases, federal and tribal regulations excluded state regulation. *Id.* at 186. In contrast, the state district court in *Cotton Petroleum* found that "New Mexico provide[d] substantial services to both the Jicarilla Tribe and [the lessee]," that "no economic burden f[ell] on the tribe by virtue of the state taxes," and that " the State regulates the spacing and mechanical integrity of wells located on the reservation," indicating that the federal regulations were merely "extensive" and not "exclusive." *Id.* at 185-86. Thus, the "particularized inquiry" in *Cotton Petroleum* was based on a situation that was the polar opposite of the situations in *Bracker* and *Ramah*.

The Supreme Court acknowledged that, despite the finding of the state district court, the taxes might have some impact on the Tribe. *Id.*; *see also id.* at 208 (Blackmun, J., dissenting) (analyzing the economic impact on the Tribe). Importantly, the Supreme Court noted that "the primary burden of the state taxation f[ell] on the non-Indian taxpayers." *Id.* at 186 n.17 (majority opinion). "Any impairment to the federal policy favoring the exploitation of on-reservation oil and gas resources by Indian tribes that might be caused by these effects, however, [was] simply too indirect and too insubstantial to support [the lessee's] claim of pre-emption." *Id.* at 187. Finally, in another section not relevant to the issues here, the Supreme Court rejected the lessee's multiple taxation claim. *Id.* at 187-93.

In 1982, Congress enacted the Indian Mineral Development Act ("IMDA"). Pub. L. 97-382, 96 Stat. 1938 (codified at 25 U.S.C. §§ 2101-08). The purpose of the IMDA was threefold:

to allow for longer exploratory periods than possible under the IMLA; to avoid problems with the

IMLA's application of oil and gas concepts to hard-rock mining; and to give Tribes greater return

on their resources and enhance their self-determination by giving them greater flexibility in

negotiating mineral development agreements.   H.R. Rep. No. 97-746, at 4 (1982), *reprinted in*

1982 U.S.C.C.A.N. 3463, 3464. Thus, under the IMDA, Tribes can enter into joint ventures,

production sharing agreements, and leases for periods other than the ten years prescribed by the

IMLA. 25 U.S.C. § 2102. After a Tribe negotiates an agreement, it is subject to approval by the

Secretary of the Interior after finding that the agreement is in the best interests of the Tribe. *Id.* §

2103. No federal court has considered the possible preemptive effect of the IMDA on state

taxation of IMLA agreements. The House Committee on Interior and Insular Affairs declined to

recommend an amendment proposed by the Governor of Montana to explicitly authorize "State

taxation of the non-Indian portions of, or activity under, Minerals Agreements." H.R. Rep. No.

97-746, at 8. Instead, the Committee thought it appropriate to defer to the United States Supreme

Court's development of this area of the law. *Id.* at 8-9.

　　　Although the *Cotton Petroleum* opinion did not mention the IMDA–as no leases in that

case were executed under it–the Court did consider other statutes that "evidence[d] to varying

degrees a congressional concern with fostering tribal self-government and economic

development." *Cotton Petroleum*, 490 U.S. at 183 n.14 (quoting *Colville*, 477 U.S. at 155). The

Supreme Court concluded that such concerns did not suffice to show intent to preempt state

taxation. *Id.* By extrapolation, the IMDA does not, at least in the first step of the *Cotton*

*Petroleum* analysis, differ in any significant way from the IMLA.

<u>Application of Cotton Petroleum to This Case</u>

　　　An initial question is whether *Cotton Petroleum* modified the *Bracker* analysis. The New

Mexico Supreme Court concluded that it did, to the extent that it removed the requirement stated

in *Ramah* that state services, to be relevant to the analysis, must be related to the activity taxed. *Blaze Const. Co., Inc. v. Taxation and Revenue Dept. of State of N.M.*, 118 N.M. 647, 652; 884 P.2d 803, 808 (N.M. 1994).  However, the Court of Appeals for the Ninth Circuit concluded otherwise and detected no such change. *Hoopa Valley Tribe v. Nevins,* 881 F.2d 657, 660-61 (9th Cir. 1989) (stating that *Cotton Petroleum* "reaffirmed" *Bracker* and *Ramah* and applying the relatedness test to the state's services). The *Blaze Construction* decision rests on shaky grounds, because it takes language from the section of the *Cotton Petroleum* opinion that rejected the lessee's multiple taxation claim and grafts that language to the United States Supreme Court's *Bracker* analysis of the lessee's preemption claim. It is likely that the United States Supreme Court in  *Cotton Petroleum* did not consider the issue simply because the state district court in its findings of fact failed to distinguish between related and unrelated state services. In any case, this issue need not be decided here. It does not matter whether all state services should be included, as the State of New Mexico offers no significant services to the UMUT other than those related to oil and gas operations.

Another supposed modification recognized by the New Mexico Supreme Court in  *Blaze Construction*  must also be rejected. The New Mexico Supreme Court stated that, in *Cotton Petroleum*, "the Supreme Court held that indirect, insubstantial, or marginal burdens on tribal interests do not support a claim that a state tax is preempted." *Blaze Construction*, 118 N.M. at 653; 884 P.2d at 809. While that may be true as to insubstantial or marginal burdens, it is incorrect as to indirect ones. In fact, the indirect burden placed on the tribes in  *Blaze Construction*–imposition of a gross receipts tax on a construction company building roads on

reservations, *id.* at 804–squarely matches that in *Ramah*, which remains good law.[5] The *Cotton Petroleum* opinion merely states that the burden in that case was "*too* indirect and *too* insubstantial." *Cotton Petroleum*, 490 U.S. at 187 (emphasis added). There is simply no categorical rule that *any* indirect burden cannot be a basis for preemption.

A more important issue is how to treat a case that falls between *Bracker* and *Ramah* on one hand and *Cotton Petroleum* on the other. The United States Supreme Court in *Cotton Petroleum* described the situations in *Bracker* and *Ramah* as involving "special factors." *Cotton Petrleum,* 490 U.S. at 187. Although the Supreme Court did not specify what those special factors were, they can be inferred from the Supreme Court's earlier discussion: 1) "both cases involved complete abdication or noninvolvement of the State in the on-reservation activity," *id.* at 185; 2) in both, the economic burden fell on the Tribes, *id.*; and 3) in both, the federal and tribal regulations were "exclusive," *id.* at 186. On the other hand, in *Cotton Petroleum,* the Jicarilla Apache Tribe failed to assert any interest, suffered no economic burden, and allowed the State to regulate wells on its lands.  In any case, to infer from *Cotton Petroleum* that *Bracker* balancing applies only where there is a "complete abdication" by the State would be to effectively overrule *Bracker*. Under *Bracker*, there must be "a particularized inquiry into the nature of the state, federal, and tribal interests at stake." *Bracker*, 448 U.S. at 144-45. If this inquiry is to take place only where there is no state interest at all, then there is no need for the inquiry: a balancing test is then replaced by a categorical rule. The Court concludes that *Bracker* balancing applies even when a case falls somewhere between *Bracker* and *Cotton Petroleum.*

---

[5]   It should be noted that the Supreme Court of the United States upheld a similar Arizona tax, but on the basis that *Bracker* balancing should not apply to state taxation of private federal contractors. *Ariz. Dept. of Revenue v. Blaze Const. Co., Inc.*, 526 U.S. 32, 36-38 (1999). That is not the situation here.

Similarly, in this case the Court must consider whether *Cotton Petroleum* should be construed broadly as holding that states may always impose a severance tax on non-Indian extraction of oil and gas on reservations. In *Montana v. Crow Tribe of Indians*, 523 U.S. 696 (1998), a case discussing *Cotton Petroleum*, certain introductory language supports a broad construction. *Id.* at 710 (stating that in *Cotton Petroleum*, "this Court held that both State and Tribe may impose severance taxes on on-reservation oil and gas production by a non-Indian lessee"). That language is belied by a close reading of *Cotton Petroleum* itself, and by the later, more detailed discussion in *Crow Tribe*. For example, later in *Crow Tribe* the Supreme Court clarified the holding of *Cotton Petroleum* more specifically by saying, "the IMLA did not preempt New Mexico's nondiscriminatory severance taxes on the production of oil and gas on the Jicarilla Apache Reservation by Cotton Petroleum, a non-Indian lessee." *Id.* at 714. According to the *Crow Tribe* opinion, "*Cotton Petroleum* clarified that neither the IMLA, nor any other federal law, *categorically* preempts state mineral severance taxes imposed, without discrimination, on all extraction enterprises in the State, including on-reservation operations." *Id.* (emphasis added); *see also id.* at 712 ("similar state taxes are *not always* preempted") (emphasis added). Since *Cotton Petroleum* did not create a categorical rule, the *Bracker* analysis continues to apply to state severance taxes imposed on non-Indians extracting oil and gas on reservations.[6]

The discussion now turns to the details of the analysis, following the sequence taken by the United States Supreme Court in *Cotton Petroleum*. First, the IMLA and the IMDA will be

---

[6] It should also be noted that the district court, in an earlier stage of the *Crow Tribe* litigation, made several findings of fact that distinguish the situation there from the facts in this case. For example, the coal mining at issue in *Crow Tribe* took place on a strip of land ceded by the Crow Tribe over which state and local governments exercised jurisdiction but the Crow Tribe did not at all. *See Crow Tribe of Indians v. United States*, 657 F. Supp. 573 (D. Mont. 1985). As a result, the state and local governments provided almost all services on the strip, while the Tribe provided almost none. *See id.* at 579-81.

considered under ordinary principles of statutory interpretation. Next, the "historical backdrop" of relevant tribal sovereignty will be reviewed. Finally, *Bracker* balancing will be carried out, taking into account the three factual areas deemed important by the *Cotton Petroleum* Court: the State's involvement in the activity, the economic burden of the tax, and the extent of federal and tribal regulation.

Of course, the Supreme Court in *Cotton Petroleum* already analyzed the IMLA under ordinary principles of statutory interpretation and found no Congressional intent to prohibit state taxation. As discussed above, a similar analysis finds no Congressional intent to prohibit–or to allow–state taxation of IMDA agreements. On the other hand, "even applying ordinary principles of statutory interpretation," the express authorization for state taxation in the 1924 Act was repealed by the IMLA. *Blackfeet Tribe*, 471 U.S. at 767.

As a result, the historical backdrop of tribal sovereignty in this case differs significantly from that in *Cotton Petroleum*. Oil and gas leases on treaty or statutory reservations were completely immune from state taxation for 33 years, from 1891, when leases were first authorized, to 1924, when Congress expressly authorized taxation of the leases. However, that congressional authorization expired under its own terms 14 years later in 1938 when Congress replaced 1924 leases with the new regime of the IMLA. After 1938, state taxation of leases was neither expressly authorized by Congress nor prohibited under the Supreme Court's doctrine.

In this case, unlike in *Cotton Petroleum*, the historical backdrop of the UMUT's tribal sovereignty is significant.[7] As noted in the findings of facts, the UMUT had a reservation as far back as 1868 and rights to the New Mexico lands no later than 1895. The period of complete immunity clearly applied to the UMUT. Thus, there is an "important backdrop" of Tribal sovereignty here

---

[7]   *Compare Cotton Petroleum*, 490 U.S. at 182 ("There is [] simply no history of tribal independence from state taxation" of lessees on *executive* reservations), *with Bracker*, 448 U.S. at 145 n.12 (shifting federal policies on tribal timber sufficing to demonstrate tribal sovereignty).

that acts as a thumb on the scales in favor of the UMUT that the United States Supreme Court in *Cotton Petroleum* did not afford the Jicarilla Apache Tribe, perhaps due to the lack of a corresponding historical backdrop.

Next, keeping in mind the important backdrop of the UMUT's sovereignty, the Court will address the three factual areas important to the *Bracker* analysis:  1) the economic burden of the taxes, 2) the extent of federal and tribal regulation, and 3) the state's involvement with and interest in the activity.

*The Economic Burden of the Five State Taxes*

The economic burden of the five New Mexico taxes falls primarily on the UMUT. Although it is not entirely clear how the taxes are currently taken into account by the parties when the UMUT negotiates new leases or agreements, there is at least evidence that some of the agreements impose a cap on UMUT revenue. However, the much more important effect is on existing leases, under which the great majority of oil and gas development on the New Mexico lands has occurred. For those leases, the evidence shows that the taxes impair, in practically one-to-one proportion, the ability of the UMUT to impose additional taxes. This conclusion follows from the simple facts that neither the UMUT nor the operators have the power to affect the market price of oil and gas, but the operators have the power and ability to go to places other than the New Mexico lands to extract oil and gas if the UMUT imposes an additional tax.

The opposite result reached by the state district court in *Cotton Petroleum* can be fairly easily explained. First, the Jicarilla Apache Tribe was not a party in *Cotton Petroleum*. Second, the lessee, Cotton Petroleum, only presented evidence of the economic burden on it, but no evidence of the economic burden on the Jicarilla Apaches. In fact, the lessee's (Cotton Petroleum's) multiple taxation claim–which depended on the burden on the lessee–would have

been weakened had Cotton Petroleum shown that the taxes were passed on in some way to the Jicarilla Apache Tribe.  It should be noted that Cotton Petroleum, the lessee, seemed to regard the multiple taxation claim as its stronger one.  *See Cotton Petroleum*, 490 U.S. at 170. It was the Jicarilla Apache Tribe–which only participated as an  *amicus*–that pushed the preemption theory. *See id.*  at 170-71. In any case, the factual finding of the state district court in *Cotton Petroleum* does not bind the UMUT or this Court.  As to the economic burden, this case fits squarely with *Bracker* and *Ramah*.

Taking a cue from *Cotton Petroleum*, Defendant argues that the burden on the UMUT is too insubstantial to support preemption.  However, in *Bracker* the state taxes imposed a burden of less than 1% on tribal timber profits but were still found invalid by the Supreme Court.  In the present case the burden is of a greater magnitude.

As noted in the Findings of Fact, in the absence of the five New Mexico taxes, the UMUT could implement Resolution No. 3874 to increase its severance tax and—assuming the market for oil and gas remained stable—raise an additional $1,300,000 in revenue, an increase of approximately $650 per enrolled member per year.  While an additional $650 per member may not appear significant to the average New Mexico resident, that money would represent an almost 8% increase in the average per capita income of UMUT members.  Likewise, even if the UMUT rescinded Resolution No. 3874, oil and gas production on the New Mexico lands would become more attractive relative to oil and gas production elsewhere in New Mexico, which would result in increased production through discovery of new sources of oil and gas on the New Mexico lands.  That increased production would increase UMUT revenues from royalties and the current taxes.  In short, the five New Mexico taxes impede UMUT revenue and result in an economic burden on UMUT members.  Thus, in view of the significantly different facts in this case, Defendant's "insubstantial burden" argument is unpersuasive.

<u>*The Extent of Federal and UMUT Authority over Oil and Gas Operations*</u>

In *Cotton Petroleum*, the United States Supreme Court stated that federal and tribal regulation of oil and gas operations, although admittedly extensive, was not exclusive. In so doing, the Supreme Court did not engage in a *de novo* review of the federal and tribal regulations. Instead, it  relied on the state district court's factual finding that New Mexico regulated well spacing and mechanical integrity. As with the economic burden issue, the state district court's factual finding regarding lack of federal or Jicarilla Apache tribal regulation does not bind the Ute Mountain Utes or this Court.

When considered as a mixed question of law and fact it is clear that New Mexico does not regulate oil and gas operations on the New Mexico lands and that the federal regulations are therefore exclusive. This conclusion follows after carefully examining the areas NMOCD purports to regulate. First, though, the federal regulations must be generally described.

For unallotted lands, such as the UMUT Reservation, the Bureau of Indian Affairs ("BIA") has implemented the IMLA in a set of regulations at 25 C.F.R. Part 211. For the IMDA, the BIA's implementing regulations are at 25 C.F.R. Part 225. The bulk of the regulations are concerned with leases and agreements themselves, an area NMOCD does not purport to regulate on the New Mexico lands. For the area that NMOCD does purport to regulate–oil and gas operations–the BIA has adopted BLM regulations and has given BLM authority to enforce them. 25 C.F.R. §§ 211.4 (IMLA leases), 225.4 (IMDA agreements). The BLM regulations, codified at 43 C.F.R. Part 3160, apply to all oil and gas operations on both federal public lands and tribal lands. 43 C.F.R. § 3161.1(a). Generally speaking, the BLM has authority to do, among other actions, the following: 1) "to approve, inspect and regulate" oil and gas operations; 2) "to require compliance ... with the regulations" in Title 43; 3) "to require ... protect[ion] of other natural resources and the environmental quality"; 4) to require "protect[ion] of life and property"; 5) to

56

ensure "the maximum ultimate recovery of oil and gas with minimum waste"; 6) "to enter into cooperative agreements with States [] and Indian tribes relative to oil and gas development and operations"; and 7) to "issue written and oral orders to govern specific lease operations." *Id.* § 3161.2.

The federal regulations will now be compared to the specific areas that NMOCD purports to regulate. First, NMOCD purports to regulate well spacing and non-standard well locations. However, the federal regulations make clear that the BLM exercises primary authority over these matters. Before an oil and gas operator can drill on tribal lands, the operator must submit an APD to the BLM. *Id.* § 3161.3-1(c). "Each well shall be drilled in conformity with an acceptable well-spacing program at a surveyed well location approved or prescribed by the [BLM] after appropriate environmental and technical reviews." *Id.* § 3161.3-1(a). Acceptable well-spacing programs include not only ones which conform with State rules and orders–when approved by the BLM–but "any other program established" by the BLM.   *Id.* Thus, should NMOCD impose a well spacing or location that the BLM disfavors, the BLM is free to ignore it by establishing its own program. It cannot be said in any meaningful sense that NMOCD regulates well spacing and non-standard locations. Instead, on the New Mexico lands, NMOCD well spacing and location regulations and orders serve merely as guidelines or suggestions–albeit ones from acknowledged experts in the area–that the BLM finds convenient and efficient–for itself, for the operators, and for the Tribe–to adopt. And the 1999 Memorandum of Understanding displays the BLM's power to enter into agreements with the State on well spacing and simultaneously retain its jurisdiction on Indian lands. *See* Amended Memorandum of Understanding Between the Colorado and New Mexico Bureau of Land Management and the New Mexico Oil Conservation Division Regarding Well Spacing on Indian Lands ("Well Spacing MOU") at 1.

Nonetheless, NMOCD argues that it has the power–which, as noted in the Findings of Fact, it has used–to enforce its regulations and orders in regard to the New Mexico lands by revoking an operator's permission to transport oil and gas within the State.  This revocation power does not demonstrate that NMOCD, instead of the federal  government or the UMUT, has authority over the New Mexico lands.  If BLM chose to ignore an NMOCD regulation or order and enforce its own regulation or order, while the NMOCD tried to enforce its own conflicting regulation or order, the NMOCD would immediately run afoul of the Supremacy Clause. U.S. Const. art. VI, § 2. Although NMOCD has a certain amount of power over the operators, it cannot use that power to acquire jurisdiction over the New Mexico lands. *Cf. Mescalero Apache Tribe*, 462 U.S. at 338 (state's power to regulate hunters and fishermen outside reservation if imposed on reservation would inevitably cause conflict with tribal regulation on reservation). On the New Mexico lands, NMOCD regulations and orders serve at the pleasure of BLM and the UMUT were it to enact its own oil and gas regulations.

NMOCD also argues that the BLM lacks the power to adjudicate disputes between operators. The Well Spacing MOU proves otherwise. Although no longer in force, it provided for appeal of "setting of oil and gas well spacing, approval of exception locations for wells, approval of non-standard spacing units and compulsory pooling" on the New Mexico lands to the BLM State Director and then to the IBLA. *See* Well Spacing MOU at 2, 5-6.[8] Indeed, the IBLA has reviewed the decision of a BLM State Director to set well spacing on Southern Ute lands in Colorado. *San Juan Alliance et al.*, 129 I.B.L.A. 1 (1994). The IBLA specifically rejected a challenge that it lacked "authority to review BLM decisions involving oil and gas operations on

---

[8]   More precisely, the Well Spacing MOU provided for an initial, non-binding hearing before NMOCD and a draft order from NMOCD subject to approval by the BLM State Director. Well Spacing MOU at 4-5. This provision is another example of BLM's use of the expertise of NMOCD while retaining jurisdiction over oil and gas operations.

Indian lands." *Id.* at 4. The IBLA noted that BLM regulations explicitly provide for appeal of decisions of a State Director to the IBLA. *Id.* (citing 43 C.F.R. §§ 3160.0-1, .0-2, .3-1(a), 3165.4(a)).

Finally, NMOCD argues that the BLM, in light of its trust responsibilities to the UMUT, could not serve as a neutral arbiter in any dispute between operators on the New Mexico lands. However, NMOCD failed to present any evidence of bias in BLM adjudications. In fact, *San Juan Alliance* displays the contrary: the challenge rejected by the IBLA was brought by the Southern Utes. *Id.* The IBLA noted, "The Board has long asserted jurisdiction in cases arising from BLM decisions involving Indian lands." *Id.*; *see also Burlington Resources Oil & Gas Co.*, 146 I.B.L.A. 272 (1998) (appeal of decision of BLM State Director in dispute between two operators on Southern Ute lands). More generally, due process in administrative appeals requires only that the actual decisionmakers, not the agency, be unbiased. *See Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n*, 426 U.S. 482, 495-96 (1976).

Similar reasoning applies to the other areas NMOCD purports to regulate. For example, the scope of the New Mexico "pit rule" falls within the BLM authority to order operators to "conduct operations in a manner which protects the mineral resources, other natural resources, and environmental quality." 43 C.F.R. § 3162.5-1(a). NMOCD regulation of well casings also falls within BLM authority to "protect the mineral resources [and] other natural resources." *Id.* NMOCD regulations designed to prevent and mitigate the release of hydrogen sulfide fall within BLM authority to require operators to "perform operations and maintain equipment in a safe and workmanlike manner." *Id.* § 3162.5-3. There is no area that NMOCD purports to regulate that it in fact regulates on the New Mexico lands. "It is well established that [a State commission] has no jurisdiction over lands held in trust by the Federal Government for Indian tribes or individual Indians." *Assiniboine & Sioux Tribes*, 85 I.B.L.A. 39, 42 (1985), *rev'd on other grounds*,

*Assiniboine and Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil and Gas Conservation of the State of Mont.,* 792 F.2d 782 (9th Cir. 1986) (implicitly accepting that jurisdiction rests solely in the BLM).

In sum, NMOCD does not regulate any oil and gas matter on the New Mexico lands. Instead, BLM does, and it does so often by adopting NMOCD decisions. The BLM's sensible approach makes use of NMOCD's undoubted expertise in oil and gas matters but retains BLM's jurisdiction as the law requires. As the next section discusses, though, even use of NMOCD's expertise fails to justify the imposition of the five taxes.

<u>*State Involvement and Interest in Oil and Gas Operations on the New Mexico Lands*</u>

Although in theory NMOCD provides several services for oil and gas operations on the New Mexico lands, practice shows that the benefit conferred is minimal. Despite NMOCD's argument that only NMOCD can provide a neutral forum for a dispute between operators, there is no evidence that such disputes occur on the New Mexico lands. Similarly, due to the lack of actual conflict and the dominance of oil and gas development on the New Mexico lands by just two companies, NMOCD setting of well spacing and approval of non-standard locations (as adopted by BLM) provides minimal benefit to the operators. And, as the oil and gas pools lie almost exclusively under the New Mexico lands, NMOCD's interest in preventing waste and protecting correlative rights outside the New Mexico lands fails to justify NMOCD's purported regulation of wells inside the lands. *See Mescalero Apache Tribe*, 462 U.S. at 342 (state interest less where activity causes no spillover effects outside reservation). Furthermore, the UMUT does not make use of NMOCD's site inspection service.

NMOCD also fails to show an actual interest in environmental effects on the New Mexico lands. Defendant provided evidence of only two minor incidents of hydrogen sulfide leaks there. And Defendant presented no evidence that NMOCD's general interest in protecting groundwater

translated into protection of specific aquifers lying at least partly outside the New Mexico lands.
Similarly, there was no evidence that the localized surface environmental degradation that the "pit
rule" seeks to prevent could somehow spread off the Reservation. Although NMOCD offers
services such as plugging abandoned wells, NMOCD has not plugged wells on the New Mexico
lands and the evidence shows the UMUT is able to manage environmental problems without
NMOCD's assistance.

Finally, Defendant presented no evidence that the records NMOCD makes available are
actually used with respect to the New Mexico lands. In sum, the State's involvement with and
interest in oil and gas operations on the New Mexico lands is minimal.

### *State Provision of Services Outside of the New Mexico Lands*

Defendant argues that the State's involvement with and interest in the transport of oil and
gas outside of the New Mexico lands is important and affords significant benefits to the UMUT.
After all, the economic value of the oil and gas would be substantially less without a physical
infrastructure – state roads and pipelines in New Mexico – to transport it, an infrastructure in
which the State necessarily takes an interest.  Similarly, the State contends that it provides
indirect services and benefits to the UMUT through its off-reservation regulation and
maintenance of oil and gas operations, for instance by plugging wells in Eddy County, on the
opposite end of the State.  Accordingly, the State argues that exempting the oil and gas operators
on the New Mexico lands from the five taxes would be tantamount to allowing wealthy corporate
and individual taxpayers to claim exemption from State taxes if they could prove that their wealth
made them non-consumers of government services or to demand that their tax dollars be traceable
to services provided directly to them.  The State's arguments in this regard are without support in
the law.

*Ramah* instructs that services provided outside a reservation are not to be taken into account in *Bracker* balancing. *Ramah*, 458 U.S. at 844. As in *Ramah*, the revenues from taxing the activities of operators extracting oil and gas outside the New Mexico lands are presumably enough to recompense the State for its provision and regulation of the infrastructure. *Id.* at 844 n.9.  In  *Bracker*, the economic value of tribal timber would likely have been minimal in the absence of Arizona state roads outside the White Mountain Apache Reservation to transport the timber to market, but those state roads played no part in the analysis. *See Bracker*, at 146-52. Here, the physical infrastructure and services off the New Mexico lands provided and regulated by the State of New Mexico should similarly play no part in the analysis.

<u>Conclusion</u>

The District Court must confront the intriguing and interesting problem of choosing precedent from the United States Supreme Court that most closely fits the facts of this case, which fall neatly between the facts underlying Supreme Court decisions that go in opposite directions.  This case falls much closer to *Bracker* and *Ramah* than to *Cotton Petroleum*. First, there is a significant backdrop of tribal sovereignty. Second, although the State of New Mexico is not absolutely uninvolved in oil and gas operations on the New Mexico lands, its involvement is minimal. Third, the economic burden falls heavily on the Tribe. Fourth, to the extent that State of New Mexico regulations are adopted by the BLM, the BLM does so for its own purposes; it cannot be said that the State of New Mexico in fact regulates oil and gas operations on the New Mexico lands. The Ute Mountain Ute Tribe should be given the relief it seeks: an injunction against imposition of the five taxes on non-Tribal operators extracting oil and gas on the New Mexico lands.

_____

SENIOR UNITED STATES DISTRICT JUDGE